IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 10-cv-00208-WDM-KLM

COLORADO TRUST FOR PROTECTION & BENEFITS,
RAYMOND MCCARTY, and
SANDRA MCCARTY

    Plaintiffs,

v.

SOUDER, MILLER & ASSOCIATES, INC.
a New Mexico corporation,

    Defendant.

---

**ORDER ON MOTION TO DISMISS AND MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

Miller, J.

This matter comes before me on the Motion to Dismiss Amended Complaint (ECF No. 24) and brief in support (ECF No. 25) filed by Defendant Souder, Miller & Associates, Inc. ("SMA"). Plaintiffs oppose the motion. Also before me is the Plaintiffs' Motion for Partial Summary Judgment (ECF No. 29), seeking summary judgment on the liability elements of their claims of trespass and nuisance. For the reasons set forth below, SMA's motion to dismiss will be granted in part and denied in part. Plaintiffs' motion will be denied.

Background

According to Plaintiffs' Amended Complaint (ECF No. 23) ("Complaint"), Plaintiffs own two parcels of real property in Montezuma County, Colorado. Complaint, ¶ 1 of

General Allegations.  SMA entered onto the Property, "ostensibly for the purpose of testing the Plaintiffs' property for historic use as a site for purveyance of petroleum products" and represented that they were directed by authorities to "probe" for possible sources of toxic substances.  *Id.* at ¶¶ 2-3 of General Allegations.  Plaintiffs allege, however, that SMA had actual knowledge that one of their clients had spilled significant amounts of benzene and benzene derivatives and that these contaminants had penetrated the soil to underground aquifers.  *Id.* at ¶ 4 of General Allegations.  Plaintiffs allege that SMA did not disclose this to Plaintiffs and that SMA did not have required permits to conduct its drilling activities.  *Id.*  Plaintiffs further contend that SMA knew or should have known that "drilling into the underground strata would release contaminants into the adjacent waters of the United States" or, alternatively, that SMA was recklessly indifferent to the consequences of its acts.  *Id.* at ¶ 6 of General Allegations.  Plaintiffs state that the discharge of contaminants is ongoing because, *inter alia*, SMA failed to purge underground lines leading to former dispenser locations on Plaintiffs' property.  *Id.* at ¶ 7 of General Allegations.

Plaintiffs assert a claim under the Clean Water Act, alleging that SMA's drilling, excavating, and core sampling has created a discharge of benzene, salinated water, and/or hydrocarbon fuel derivatives onto the groundwater and surface water of Plaintiff's property.  *Id.* at ¶¶ 2, 5 of Count I.  Plaintiffs contend that their property is located at the headwaters of a tributary of the upper West Mancos River watershed.  *Id.* at ¶ 4 of Count I.  Plaintiffs allege that in drilling, SMA pierced the underground strata containing the aquifers as well as subterranean deposits of contaminants, which amounts to a "discharge" of contaminants.  *Id.* at ¶¶ 9-10 of Count I.  The Complaint states that SMA

drilled approximately sixty holes to the depths of up to seventy feet on Plaintiffs' property and that SMA abandoned the holes "knowing that their abandonment would perpetuate the ongoing discharge into waters of the United States." *Id.* at ¶¶ 7-8 of Count I.

Plaintiffs also assert claims based on Breach of Contract, claiming generically that SMA "breached any agreements with the Plaintiffs" in bad faith and that Plaintiffs have incurred damages as a result of the alleged breaches, as well as breach of the implied covenant of good faith and fair dealing. *Id.*, Counts II & III. Plaintiffs also contend that SMA has anticipatorily repudiated unidentified agreements, contracts, or agreements with Plaintiffs. *Id.*, Count IV. Finally, Plaintiffs assert several tort claims, including trespass, nuisance, negligence, and strict liability for engaging in ultra-hazardous activities. *Id.*, Counts V, VI, & VII. These claims are conclusorily asserted, containing only the elements of the claims and no supporting factual detail other than what is described in the general allegations.

Plaintiffs move for partial summary judgment regarding SMA's liability on Plaintiffs' claims of nuisance and trespass. Citing no specific record evidence[1], Plaintiffs assert that the following facts are undisputed:

1. Defendant physically intruded on Plaintiffs' land by drilling 57 holes, some to a depth of 70 feet, encasing the wells in steel and concrete, then leaving the wells permanently in place.

---

[1]Plaintiffs have failed to adhere to the requirements of Fed. R. Civ. P. 56 and my Pretrial and Trial Procedures with respect to motions for summary judgment. Although Plaintiffs have submitted exhibits and affidavits in support of their motion, they have not, as required by the rule and my procedures, provided a specific reference to record material that establishes each purportedly undisputed fact.

2. Plaintiffs were legally entitled to possession of their property.

3. Defendant did not have proper permission to enter on the Plaintiffs' land "for the purposes of committing waste and destruction on the property, or, to build massive and invasive structures on the property."

4. Defendant committed physical waste and destruction on the Plaintiffs' property as a result of the intrusion, drilling and construction of the wells.

5. Defendant's actions in constructing the wells cause the release of water under pressure, which destroyed Plaintiffs' adjacent commercial building, added pollution to the waters of the United States and to Plaintiffs' property, and reduced the value of Plaintiffs' property to zero.

6. Defendant substantially invaded the Plaintiffs' property interfered with the Plaintiffs' interest, use, and enjoyment of their property.

7. Defendant's intrusion was intentional and unreasonable, or, in the alternative, was so abnormal, or out of place in its surroundings, as to fall within the principle of strict liability.

Pls.' Mo. For Partial Summ. J., ECF No. 29, at 2-3. These purported "facts" are primarily legal conclusions and are unsupported by any citation to the record. Although I could deny Plaintiffs' motion on this basis alone, I will nonetheless review the evidence provided to determine what facts, disputed or undisputed, are shown.

Plaintiffs provide a sworn affidavit from Plaintiff Raymond McCarty ("McCarty"). McCarty Aff., ECF No. 29-1. McCarty states that he was contacted in April 2006 by Walter Gage, an employee of SMA, who informed McCarty that the State of Colorado was requiring Defendant to "monitor" a former gas station on the Plaintiffs' property. *Id.*

¶¶ 4-5. According to McCarty, Gage "represented to me, as a matter of fact, that if I did not cooperate with the Defendant, the State of Colorado would impose a ruinous lien on the Plaintiffs' property for Plaintiffs' failure to 'cooperate' with the Defendant." *Id.* ¶ 6. McCarty asserts that SMA was and is acting solely on behalf of the former owner[2] of the gas station equipment, *Id.* ¶ 7. McCarty states that SMA then entered on the property and began to "explore for contamination of the site caused by their client . . . the former owner of the gas station equipment." *Id.* ¶ 8. He asserts that Plaintiffs "have never given the Defendant any permission for destructive or intrusive testing." *Id.* ¶ 9.

According to McCarty, on or about May 11, 2006, the former gas station equipment owner was ordered by the State of Colorado to remove certain equipment containing petroleum products from the property. *Id.* ¶ 10. It is unclear on what basis McCarty claims to have personal knowledge of this. Thereafter, on or about August 22, 2006, SMA's client spilled substantial amounts of the petroleum products on Plaintiffs' property, which then spread through the soil. *Id.* ¶ 12. Again, the source of McCarty's personal knowledge in this regard is not provided. Although SMA was aware of this event, according to McCarty, SMA made no effort to notify Plaintiffs, although the State of Colorado was informed. *Id.* ¶ 13.

Thereafter, around August 24, 2006, the State of Colorado ordered SMA to begin deep drilling on Plaintiffs' property to explore the extent of the contamination. *Id.* ¶ 14. Again, McCarty avers that Plaintiffs were not informed and Plaintiffs did not give SMA permission to conduct drilling. *Id.* A letter dated September 21, 2006 from SMA to a state agency concerning sampling activities for the "Wild Wild Rest petroleum storage

---

[2]Other evidence shows that this former owner is an entity called Fraley & Company, Inc. ("Fraley").

tank release site" states "SMA does not have permission for property access from the property owner. . . The owner of the property, Mr. Ray McCarty, has been out of the state for 2 months. SMA does not expect to receive property access until October 8, 2006." Sept. 21, 2006 Letter, ECF No. 29-3.

According to McCarty, SMA ultimately drilled 45-60 holes on Plaintiffs' property that were up to 70 feet in depth. McCarty Aff., ECF No. 29-1, ¶ 15. No permits were obtained. *Id.* ¶ 16. McCarty claims that SMA represented to the state and to Plaintiffs that the drilling was needed to locate contamination from a "phantom bulk storage facility that had been present on the property in the 1950's and 1960's" but in fact the drilling was to determine the spread of the contamination from the August 22, 2006 spill. *Id.* ¶ 17. McCarty believes there never was a bulk storage facility on the property and that all contamination on the property is from the spill. *Id.* ¶ 17.

McCarty's affidavit contains a diagram of the old service station facilities on the property and shows that a pond is located near the dispenser island. *Id.* ¶ 19. McCarty avers that the pond flows into "Mud Creek" which in turn flows into the Mancos River and is therefore part of the waters of the United States. *Id.* ¶ 20. Although it is somewhat unclear when this occurred or whether this is the same as the drilling previously identified, McCarty states that Defendant "began drilling extensively on Plaintiffs' property" and that this drilling penetrated a layer containing pollutants 25 feet below the surface. *Id.* ¶¶ 23-24. McCarty presents a diagram prepared by an engineer that purports to depict how the drilling would have caused water to fill the drill holes, carrying pollutants with it, and then to migrate through the old gas station structures, to reach the pond. *Id.* ¶ 28. McCarty asserts this water flow also caused problems to the

foundation of Plaintiffs' "building" [presumably the old filling station's office and store], causing its support structures to fail, and further caused the contamination to spread in such a manner that the value of Plaintiffs' property is reduced to nothing.  *Id.* ¶ 29.

Also included with Plaintiffs' motion is a report, enclosed with a cover letter dated October 12, 2007, from SMA to the Colorado Department of Labor and Employment, Division of Oil and Public Safety.  Oct. 2007 Report, ECF No. 29-4.  The report is entitled "SCR Addendum with June 2007 and September 2007 Quarterly Monitoring Report, Wild Wild Rest Petroleum Storage Tank Release Site, Mancos, Colorado, Event ID # 10184, October 2007."  According to the report, a "confirmed release on the site was reported on August 23, 2006 during the removal of three aboveground storage tanks."  *Id.* at 2.0.  In January 2007, five soil borings were drilled and five ground water monitoring wells were installed.  *Id*.  Two new monitoring wells were installed on August 14, 2007.  *Id.* at 4.0.  A description of the wells is provided, including their components and installation.  *Id*.  The report also describes the gauging of the ground water monitoring wells and water sampling in June 2007 as well as September 2007.  *Id.* at 6.1 & 6.2.  Test results, diagrams of the monitoring wells, and other data are also provided.  *Id.* and Appendices A-C.

Not surprisingly, SMA disputes many of the facts alleged in McCarty's affidavit.  It provides affidavits from its own witnesses, including Reid Allan and Walter Gage, both geologists with SMA, and Shawna Chubbuck, a staff scientist at SMA.  Exhs. A-1, A-2, and A-3 to Def.'s Resp., ECF Nos. 31-1 to 31-3.  SMA also provides other documents regarding the course of dealing between the parties and the regulatory agencies.  According to SMA's evidence, only fifteen monitoring wells have been installed and only

two were abandoned because of unstable soils. Allan Aff., ECF No. 31-1, ¶¶ 2-3. According to Allan, SMA has not abandoned the wells but rather Plaintiffs have refused SMA access to the property. *Id.* ¶ 4. Allan provides contrary evidence regarding the construction and depth of the wells, asserting that the deepest well is only 40 feet deep. *Id.* ¶¶ 5-7. SMA's evidence is that the monitoring wells were installed at the direction of the Colorado Division of Oil and Public Safety ("OPS") and that such wells are a common and reasonable means of dealing with former gasoline stations with have had releases of petroleum products. *Id.* ¶¶ 8-10. Allan denies that SMA misrepresented who it worked for or misrepresented any material facts to Plaintiffs. *Id.* ¶ 10. SMA further denies that it observed any fuel being spilled on the surface of the Plaintiffs' property. *Id.* ¶ 11. According to Allan, when SMA originally requested to collect soil samples from the site in August 2006, the aboveground fuel storage tanks and piping had already been removed and there was no evidence of a surface spill on the property. *Id.* ¶ 12. Allan also denies that there is any artesian or other "impounded" water on the site but rather simply unconfined groundwater. *Id.* ¶ 13. He disputes, based on his professional experience, the explanation for the groundwater flow as depicted in McCarty's affidavit or that Plaintiffs' commercial building was damaged by the release of water as a result of SMA's activities. *Id.* ¶ 15.

Chubbuck's affidavit also provides information regarding the drilling of the monitoring wells and soil sampling. Chubbuck Aff., ECF No. 31-3. She states that the aboveground storage tanks for the gas station were removed in June 2006 by another contractor working for Fraley and that SMA was not present at the time. *Id.* ¶ 2. After the tanks were removed, SMA went to the site to collect soil samples to analyze for

possible contamination. *Id.* ¶ 3. The analysis revealed legally significant levels of contamination in the area of the dispenser pumps, which was reported to OPS. *Id.* ¶ 4. Thereafter, in January 2007, SMA installed five groundwater monitoring wells and drilled five soil borings, ranging from 12-39 feet below ground surface. *Id.* ¶ 5. The holes of the soil borings were later filled. *Id.* ¶ 6. In August 2007, two additional groundwater monitoring wells were installed. *Id.* ¶ 7. These were removed and the holes backfilled and compacted in December 2007. *Id.* ¶ 9. In March 2008, eight additional groundwater monitoring wells were installed, with depths from 15-32 feet, including one well located in a right of way adjacent to a highway. *Id.* ¶ 10. The Colorado Department of Transportation ("CDOT") issued a special utility permit for this well. *Id.*

In July 2008, SMA completed its final Site Characterization Report ("SCR") and submitted it to OPS. *Id.* ¶ 13. OPS approved the SCR and requested submission of a Correction Action Plan ("CAP"), which SMA submitted and OPS approved. *Id.* ¶¶ 14-15. Chubbuck states that she has had direct contact with Plaintiffs by telephone and on-site and that she never misrepresented who she worked for. *Id.* ¶¶ 17-18. She also states that she received verbal permission from Plaintiffs any time she needed to sample the monitoring wells. *Id.* ¶ 19. Plaintiffs, however, have refused to allow SMA access to the site and SMA has been unable to implement the approved CAP. *Id.* ¶¶ 20-21. A copy of the OPS's approval of the CAP is provided. Exh. A-5 to Def.'s Resp., ECF No. 31-5.

According to Gage's affidavit, he was responsible for the sampling and field work at the property. Gage Aff., ECF No. 31-2, ¶ 2. He asserts that he obtained verbal approval from Plaintiffs Raymond McCarty or Sandy McCarty every time SMA needed access to the property for the purpose of installing wells, sampling, or other activities.

*Id.* ¶ 3. He denies ever threatening or attempting to coerce McCarty or misrepresenting who he worked for. *Id.* ¶¶ 5-7.

A letter from Plaintiffs' attorney dated November 4, 2010 indicates that the Plaintiffs were conditioning access to the property on Fraley and SMA paying "for the current damages to the property" and making arrangements "to secure payment of future damages." Exh. A-7 to Def.'s Resp., ECF No. 31-7.

## Standard of Review

SMA seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). A complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555. The court must accept as true all well-pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*). Under *Iqbal,* a court considering a motion to dismiss may first identify allegations that are no more than conclusions, and therefore not entitled to the assumption of truth. *Iqbal* at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Then, the court may examine the well-pleaded factual allegations and determine, assuming their veracity, "whether they plausibly give rise to an entitlement to

relief." *Id.*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A moving party's burden is met if the moving party demonstrates that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## Discussion

A.  Motion to Dismiss

1.  Clean Water Act Claim (Count I)

SMA first challenges the adequacy of Plaintiffs' allegations with respect to the Clean Water Act (33 U.S.C. §§ 1301, *et seq.*) ("CWA") claim. The CWA prohibits the discharge of any pollutant from a point source unless authorized by a permit under the National Pollutant Discharge Elimination System ("NPDES"), 33 U.S.C. §§ 1311(a), 1342. To establish a violation of these sections a plaintiff must show that a defendant: (1) discharged; (2) a pollutant; (3) into navigable waters; (4) from a point source; and (5) without a permit. *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1135 (10th Cir. 2005) (citing 33 U.S.C. §§ 1311(a), (1342)). "Under the [CWA], a "discharge of a pollutant' is defined as 'any addition of any pollutant to navigable waters from any point source.'" *Id.*

SMA argues that Plaintiffs have failed to allege that SMA has "added" any pollutant to navigable waters. Rather, SMA asserts that Plaintiffs' allegations show only

that the monitoring wells penetrated zones of existing contaminants, none of which SMA placed on the site. Therefore, SMA asserts, it did not discharge a pollutant as defined by the CWA. SMA also argues that the Complaint does not adequately allege a discharge into navigable waters, citing an exemption in the NPDES regulations for water transfers, *i.e.*, "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." 40 C.F.R. § 122.3(h)(2)(i). SMA contends that to the extent the allegations show only that SMA "has transferred contaminated water from one navigable water to another navigable water" they do not show that a permit was required.

      Plaintiffs respond that their allegations that the penetration of the shale by SMA's drilling discharged benzene and benzene derivatives into the waters of the United States is sufficient to state a claim. Pls.' Resp., ECF No. 30, at 3–4 & n.1; 40 C.F.R. § 405.15 (listing benzene as a toxic pollutant). The Tenth Circuit has noted that the CWA's requirements "focus on the point of discharge, not the underlying conduct that led to the discharge." *Sierra Club,* 421 F.3d at 1143. Therefore, the fact that the pollutants were already in place does not mean that SMA could not have by its conduct "added" contaminants to navigable waters. *Id.* at 1144 ("discharge" element satisfied by contemporaneous introduction of polluted water from defendant's property, through a point source owned and maintained by defendant, to a navigable stream). Reading the allegations in the light most favorable to Plaintiffs as the non-movants, Plaintiffs appear to allege that the drilling of the holes in the shale barrier between the benzene and the aquifer caused the pollutants to combine with the aquifer water, which then was released into the navigable waters of the United States. This plausibly shows that a

pollutant, not previously in contact with the navigable waters, was "added" to those waters, and is sufficient to state a claim.

SMA further contends that the claim fails because the Complaint does not affirmatively allege that SMA has discharged any pollutant from a "point source" and does not identify what that "point source" might be. This is unavailing as it can reasonably be inferred that Plaintiffs are alleging that the monitoring wells are the point source of the contaminants. Finally, SMA argues that it is generally understood that monitoring wells are generally subject to other state and federal laws, not the NPDES program. While this may be so, this is not sufficient to show that Plaintiffs could not state a claim under the CWA.

Alternatively, SMA argues that the CWA claim fails because citizen suits may only be brought against any person "alleged to be in violation of" the Act, 33 U.S.C. § 1365(a). The CWA does not confer subject matter for "wholly past violations." *Id.* SMA argues that only "migration, decomposition or diffusion of the contaminants" has occurred, which is "the prototypical definition of a wholly past violation." Def.'s Memorandum, ECF No. 25, at 7.

Plaintiffs argue in response that the addition of pollutants to the waterways of the United States began when SMA drilled through the shale layer protecting the aquifer and continues to this day because SMA has not made any effort to stop the flow of pollutants into the aquifer. Pls.' Resp., ECF No. 30, at 5. The Complaint alleges that "SMA's illegal activities are that it has discharged in 2008, 2009, 2010, and earlier years, and <u>is continuing to discharge a pollutant</u>, here chemical wastes . . . ." Complaint, ¶ 21 (emphasis added). Again, I am guided by *Sierra Club,* which held that

a mine shaft's ongoing collection and discharge of polluted waters into a stream demonstrated a present violation of the CWA, even though the original source of the contaminants was deposited in the past. 421 F.3d at 1140-41. Here, Plaintiffs have alleged that SMA's activities have created a conduit for the ongoing drainage of contaminants into a water source, which is sufficient under controlling law to establish a current violation of the CWA.

In a further challenge to the CWA claim, SMA argues that Plaintiffs' Notice of Intent to File Suit was insufficient to put it on notice of the claims that Plaintiffs' would raise in a lawsuit. The filing of such a notice is a jurisdictional prerequisite of the filing of a CWA citizen lawsuit. 33 U.S.C. § 1365(b).

The notice, attached as Exhibit B to SMA's memorandum of law (ECF No. 25-2), recites that SMA has engaged in drilling, excavating, or core-sampling on Plaintiffs' property, that these activities created a discharge of benzene, water of abnormal salinity and/or hydrocarbon fuel derivatives, and that this was done without a permit. *Id.* Although this notice does not contain all of the factual allegations contained in the complaint, such as the allegation that Fraley spilled fuel onto the surface of Plaintiffs' property, it is sufficient to give adequate notice as to the basic grounds for the CWA claim and does not support dismissal of the entire claim at this point, although it may limit the scope of Plaintiffs' claim at later points in these proceedings.

Finally, SMA contends that the appropriate statute under which Plaintiffs' claim should be brought is the Safe Drinking Water Act (42 U.S.C. §§ 300f, *et seq.*). While this might be true, it does not mean that Plaintiffs have failed to state a claim under the CWA and so I will not dismiss the claim on this basis.

2. <u>Contract Claims (Counts II, III, IV)</u>.

SMA claims that Counts II, III, and IV for breach of contract (Count II), Breach of Contract (Bad Faith) (Count III), and Anticipatory Repudiation of Contract (Count IV) fail to state claims upon which relief can be granted because they do not allege the existence of a contract. I agree that Plaintiffs' allegations are insufficient in this regard.

Plaintiffs allege no facts showing the existence of an agreement in any form. They identify no express promises made or consideration provided, and they offer no information as to how such promises were allegedly breached. To the extent that Plaintiffs rely on some theory of implied contract, as appears from their claim of breach of the implied covenant of good faith and fair dealing, it is merely a recasting of their negligence claim as a contract claim.[3] Without such elementary information regarding the nature of the alleged contract and breach, SMA has no fair notice of the basis of these purported contract claims, as required by Fed. R. Civ. P. 8. *Christensen v. Park City Mun. Corp.,* 554 F.3d 1271, 1276 (10th Cir. 2009) (plausibility requirement in pleadings serves to inform the defendants of the actual grounds of the claim against them); *see also Klebanow v. N.Y. Produce Exch.*, 344 F.2d 294, 299 (2d Cir.1965) ("[a] mere allegation that . . . a defendant made an undescribed contract with the plaintiff and breached it" is not sufficient to meet the notice pleading requirements). Accordingly, I will grant SMA's motion in this regard and dismiss Counts II, III, and IV without prejudice

---

[3]Plaintiffs allege that "[i]n inducing the Plaintiff [sic] to allow the SMA Defendant to enter their property and make tests, or, drill holes in the Plaintiffs' property, the SMA Defendant made material promises which it has not fulfilled; such promises constitute an agreement with Plaintiffs in which the Defendant directly or impliedly agreed to use due care in conducting its operations and activities." Complaint, ECF No. 23, ¶ 6 of Count III. In the absence of any alleged facts demonstrating the actual nature of the promise by SMA, I conclude Plaintiffs have not stated a claim that is plausible on its face.

to a motion to amend the complaint.

      3.    <u>Tort Claims</u>

SMA claims that Plaintiffs are barred from making claims in tort for Trespass (Count V), Nuisance (Count VI), and Negligence and Strict Liability (Count VII) by the economic loss rule. In response, Plaintiffs assert that the breach of duty covered by the tort claims are distinct from the duties under the contract. Since I will dismiss Plaintiffs' purported contract claims, the economic loss rule does not apply.

Finally, SMA argues that Plaintiffs do not adequately allege facts that would give rise to strict liability based on an "ultra-hazardous" activity. SMA contends that other than conclusorily asserting that SMA's conduct was ultra-hazardous, Plaintiffs have failed to allege any facts sufficient to establish the actual elements of such a claim, specifically:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1544 (10th Cir.1992). I agree. Although Plaintiffs have generally asserted facts that, if true, might show that SMA's drilling activities caused displacement and spread of pollutants, they have not alleged specific facts sufficient to establish that mere drilling of monitoring wells and soil sampling creates a high degree of harm, that the risk of harm cannot be eliminated by the

exercise of reasonable care, that this activity is not a matter of common usage or is inappropriate to the place where it occurred, or any facts regarding the value of the activity compared to its dangerous attributes. Accordingly, I will dismiss this claim as well, again without prejudice to a motion to amend the complaint.

B.     <u>Plaintiffs' Motion for Partial Summary Judgment</u>

Plaintiffs seek summary judgment on their claims of nuisance and trespass. To prove a claim of trespass, the plaintiff must demonstrate a physical intrusion upon the property of another without proper permission from the person legally entitled to possession. *Public Service Company of Colorado v. Van Wyk*, 27 P.3d 377, 389 (Colo. 2001). "A claim for nuisance is predicated upon a substantial invasion of a plaintiff's interest in the use and enjoyment of his property when such invasion is: (1) intentional and unreasonable; (2) unintentional and otherwise actionable under the rules for negligent or reckless conduct; or (3) so abnormal or out of place in its surroundings as to fall within the principle of strict liability." *Id.* at 391.

As to the trespass claim, Plaintiffs contend that the undisputed facts demonstrate that SMA drilled 57 holes in Plaintiffs' property, that this drilling created leaks in an underground water containment formation, which then released pressurized water, destroying the foundation of Plaintiffs' commercial building. They argue that the intrusion is shown by the presence of permanent steel casings and cement foundations in the holes. Plaintiffs also aver that their evidence shows that SMA did not have permission to enter on the property.

As shown above, Plaintiffs' facts are all disputed by competent evidence from SMA. SMA has proffered evidence that disputes Plaintiffs' assertions regarding the

number of holes drilled, their construction, whether they are permanent or have been abandoned, the existence of an underground water containment formation, and the cause of the destruction of Plaintiffs' commercial building. Also strongly disputed is whether SMA obtained permission before conducting its activities on Plaintiffs' land.[4] Accordingly, summary judgment is not appropriate.

With respect to the nuisance claim, Plaintiffs argue that SMA's conduct was so abnormal and out of place that it gives rise to strict liability as a matter of law. Plaintiffs again cite the elements required to show that an activity is ultra-hazardous. Plaintiffs argue that it is undisputed that the activity posed a high degree of risk of harm, on the grounds that "Defendant admitted in its reports to the State that they knew there was water under pressure, impounded beneath the surface of Plaintiff's property . . . Drilling 57 deep holes in the planet, through pressurized water layers is, and should be held, an inherently dangerous activity as a matter of law." Pls.' Mot. for Summ. J., ECF No. 29, at 13. I see no evidence of an admission regarding the existence of subsurface contained water and Plaintiffs have not specifically identified the document or page number in which such an admission allegedly appears.[5] Moreover, as noted, the

---

[4]In their reply brief, Plaintiffs appear to seek to exclude SMA's evidence regarding permission based on the "sham affidavit" doctrine, contending that the affidavits of SMA's employees are inconsistent with a previous interrogatory response. Pls.' Reply, ECF No. 33, at 4. I see no inconsistency between the discovery responses and the affidavits. Moreover, Plaintiffs have not established any elements needed to exclude evidence based on this doctrine. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). Plaintiffs also argue that any verbal permission obtained by SMA is ineffective because of the statute of frauds. Plaintiffs provide no persuasive argument or legal authority to show that SMA was required to obtain written permission to enter on Plaintiffs' land for its drilling and monitoring activities.

[5]Plaintiffs, again in their reply brief, refer to a statement in the October 2007 Report, discussed above, concerning the drilling of two new monitoring wells and discovery of water in the wells on August 17, 2007. Pls.' Reply, ECF No. 33, at 9.

number of holes and their depth is disputed. As to the remaining elements, Plaintiffs cite little more than their belief that the conduct at issue is likely to result in great harm, that the risk cannot be eliminated by exercising reasonable care, that the activity is not a matter of common usage, that the activity is inappropriate, and that the harm outweighs any value to the community. Plaintiffs have failed to meet their burden of demonstrating an absence of genuine issue of material fact with regard to this claim and summary judgment will be denied.

Accordingly, it is ordered:

1. The Motion to Dismiss Amended Complaint (ECF No. 24) filed by Defendant Souder, Miller & Associates, Inc., is granted in part and denied in part. Plaintiffs' contract claims and strict liability claim (Counts II, III, IV, and VII) are dismissed without prejudice. The other claims remain pending.

2. Plaintiffs' Motion for Partial Summary Judgment (ECF No. 29) is denied.

DATED at Denver, Colorado, on July 21, 2011.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge

---

Given that I must give SMA as the nonmoving party the benefit of all favorable inferences, this sentence is not sufficient to establish an admission by SMA that it had pierced an underground water containment formation, as opposed to simply revealing the existence of unconfined groundwater, as SMA contends.

PDF FINAL